IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 10, 2018

**RICHARD DICKERSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 11-02622        Paula L. Skahan, Judge**

_____

**No. W2017-01572-CCA-R3-PC**

_____

The Petitioner, Richard Dickerson, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing that he received ineffective assistance of counsel because trial counsel coerced him into testifying and failed to discover a mistake in his presentence report. After thorough review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Kirk W. Stewart, Memphis, Tennessee, for the appellant, Richard Dickerson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Charles Summers, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The Petitioner was indicted for the first degree premeditated murder of his girlfriend, but was convicted of second degree murder and sentenced to twenty-five years in the Department of Correction. State v. Richard Dickerson, No. W2012-02283-CCA-R3-CD, 2014 WL 1002003, at *1 (Tenn. Crim. App. Mar. 19, 2014), perm. app. denied (Tenn. Sept. 3, 2014). His conviction and sentence were affirmed by this court on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal

on September 3, 2014.  Id. at *12.  This court recited the facts underlying the Petitioner's case on direct appeal as follows:

Jacqueline Smith testified that she was the victim's mother.  She last saw the victim on Wednesday, November 17, 2010.  After this visit, Smith tried to contact the victim numerous times over the next several days via text messages and phone calls but got no response.  Alarmed, she called the police department on that Friday and filed a missing persons report.  She reported that the victim's boyfriend was Richard Dickerson.  Some time later, the police called and informed her that the victim's body had been found.  At the time, the victim's car was a green Mazda 626.  The victim was twenty-one years old.

Sergeant Kathy L. Gooden of the Memphis Police Department ("MPD") missing persons bureau testified that she received a missing persons report from Jacqueline Smith in November 2010.  In response to the report, she prepared a missing persons flyer including a photograph of the victim.  She also called Richard Dickerson, reported as the victim's boyfriend, to inquire if he had heard from the victim.  She identified the [Petitioner] at trial as Dickerson.  The [Petitioner] told her that the victim had spent the night of Monday, November 15, 2010, with him and that the last time he saw her was the next morning when she left.  Sgt. Gooden learned that the victim had not reported to work on that Thursday and Friday.

When Sgt. Gooden called the [Petitioner] a second time to inquire if he had heard from the victim, the [Petitioner] reiterated that the last time he saw the victim was on that Tuesday morning.  He added that the victim called him the next afternoon, Wednesday, November 17, 2010, at about 4:00 p.m.

After receiving a tip from Crime Stoppers, Sgt. Gooden and two other officers went to the [Petitioner]'s residence to speak with him in person.  The [Petitioner] then admitted that the victim "had previously gotten an order of protection on him on a domestic violence assault."  The [Petitioner] also stated that he had contacted the victim's aunt because he "had had a gut feeling that something had happened to" the victim.  Sgt. Gooden later confirmed that there had been a previous domestic violence complaint.

On cross-examination, Sgt. Gooden acknowledged that she investigated several persons as possibly responsible for the victim's disappearance.

On redirect examination, Sgt. Gooden stated that one of the tips she got through Crime Stoppers was that the victim's body would be found in the trunk of her car at the Willow Creek Apartments. A Crime Stoppers tip also claimed that the [Petitioner] had killed the victim. She gave this information to the homicide department.

LaDonna Garfield, the victim's aunt, testified that she and the victim had been close. She identified the [Petitioner] as the victim's ex-boyfriend, explaining that "they had broke up." On Wednesday evening, November 17, 2010, the [Petitioner] called and told her that he thought something had happened to the victim. The conversation was short because Garfield had to go to work. The next morning, the [Petitioner] called again, repeating that he thought something had happened to the victim. Garfield spoke with him several more times over the phone that day and the next day after the missing persons report was filed. The [Petitioner] continued to call her over the next several days "on up until the day he was arrested." His calls focused on his concerns over the victim.

Garfield testified that, on February 22, 2010, the victim had been living with Garfield's parents on Cedarwoods Cove. Garfield was in bed in the front bedroom when she heard a scream. When she got up to investigate, the victim walked past her "crying and upset." The victim went into the bathroom and locked the door. Garfield went to the carport door where her father was and looked out. She saw the [Petitioner] in the [Petitioner]'s mother's car. She returned to the victim, who came out of the bathroom and sat down on the couch in the den. Garfield described the victim's appearance as disheveled. Garfield kept asking the victim what had happened, and the victim told her that she had gotten into an altercation with the [Petitioner] at the [Petitioner]'s house. When the victim left in her car, the [Petitioner] followed her. The victim drove to Cedarwoods Cove and, as she was trying to get in the house, the [Petitioner] approached her and kept trying to talk to her. The victim told him she did not want to have anything more to do with him. The [Petitioner] told her that he would leave, but first he wanted her to give him a hug. The victim told Garfield that, when she told him no, "he grabbed her and started choking her and she's trying to get away and he slammed her down on the concrete."

- 3 -

On cross-examination, Garfield stated that the last time she saw the victim and the [Petitioner] together was in July 2010.

Britney Harrell, ex-girlfriend of the [Petitioner]'s friend Rodricus Shaw, testified that, while she was talking on the phone with Shaw, she overheard the [Petitioner] "saying that he didn't mean to kill her." She stated that she was familiar with the [Petitioner]'s voice. The following week, she overheard a phone conversation between Shaw and the [Petitioner] while Shaw's phone was in speaker-phone mode. She heard the [Petitioner] say that he had killed "her," put her body in the car, and then drove the car to some apartments in east Memphis. She reported this information to the police. She later gave a statement to the police and identified the [Petitioner] in a photographic array. Underneath his photograph, she wrote, "This is Richard Dickerson who killed Jacklyn Miller."

Vincent Ingram testified that he and the [Petitioner] had been friends since childhood. In November 2010, he lived around the corner from the [Petitioner]. One day, the [Petitioner] told him that he, the [Petitioner], thought that the victim was "setting him up" because he had found some text messages on her phone giving "some guy" the directions to the [Petitioner]'s house. The [Petitioner] told Ingram that he was going to talk to the victim about it and that she was on her way over. Later, Ingram saw the victim getting out of her car in front of the [Petitioner]'s house. Later that night, the [Petitioner] came over to Ingram's house, woke Ingram up, and told Ingram that he thought he had killed the victim. The [Petitioner] told Ingram that he had strangled the victim and that she was not moving. The [Petitioner] then left. Sometime in the next day or two, Ingram and Shaw were at the [Petitioner]'s house. Ingram overheard the [Petitioner] tell Shaw that he, the [Petitioner], had killed the victim and put her body in the trunk of her car.

Subsequently, Ingram identified the [Petitioner] from a photographic array. On the array he wrote, "This is Richard. He told me him and Jacky had a fight which led to him choking her to death."

On cross-examination, Ingram stated that, when the [Petitioner] first told him about what he had done, the [Petitioner] "was kind of shaken up a whole lot." Ingram had no doubt that the [Petitioner] loved the victim, and the [Petitioner] expressed remorse about what he had done.

- 4 -

Craig Holmes testified that he was the [Petitioner]'s cellmate in December 2010. The [Petitioner] told him that he had strangled his girlfriend.

Fred Anderson testified that he was a "courtesy officer" at Willow Creek Apartments in November 2010. His job was to patrol and make sure that nothing was out of the ordinary. Anderson stated that the first time he saw the victim's Mazda was on November 17, 2010. He noticed the victim's Mazda because he had not seen that car before. When he first saw the Mazda, he noticed "a black male walking away from the car." He had not seen that person before, but he got a good look at him. Anderson identified the [Petitioner] as the black male he saw.

Anderson testified that, after he made a full circle around the parking complex, he saw that the Mazda had been moved and "backed in." He reported what he had seen to his supervisor.

Anderson continued to see the car in the parking lot for one week. It stayed in the same place during this time. He explained that he was away at his other job when the police came to get the car.

On cross-examination, Anderson clarified that it was between 2:00 p.m. and 3:00 p.m. when he first saw the Mazda. The next time he saw it was about four to five minutes later.

Officer Russell Mooney of the MPD testified that he responded to an apartment complex after receiving a report about the victim's car. After locating the car, he notified his lieutenant. Officer Mooney described the car's location as "backed in against the fence." He remained on the scene until the car was towed. No one opened the car or inventoried it prior to its being towed away.

Officer Dewayne Johnson, a crime scene investigator with the MPD, responded to the Willow Tree Apartments on November 23, 2010, regarding a car found there that belonged to a missing person. After photographs were taken of the scene, he followed the car as it was towed to the Crime Scene Office ("CSO"). The car was not opened prior to its arriving at the CSO. After the vehicle was positioned in the CSO, Officer Johnson processed its exterior for fingerprints. He did not find any fingerprints. Officer Johnson then used an entry tool on the locked car to open the door. Officer Johnson took photographs of the car's interior and

swabbed for DNA. When officers finished searching the interior of the car, they opened the trunk and found the victim's body.

On cross-examination, Officer Johnson stated that he dusted the inside of the car for fingerprints but did not recover any.

Officer Kevin Lundy, a homicide investigator with the MPD, responded to the victim's car at the CSO. He identified photographs taken of the victim's body in the trunk of her car. He stated that, although the victim was clothed, her clothing was disheveled. The victim's bra was twisted and above her breasts, her panties were around her thighs, and her pants were unzipped and down around her hips. There was a rope around the victim's neck.

On further investigation, Officer Lundy learned that the [Petitioner] had been the last person known to have seen the victim. Officer Lundy prepared a photographic array with the [Petitioner]'s photograph and showed the array to Anderson on November 24, 2010. Anderson identified the [Petitioner]'s photograph as the man he had seen near the victim's car in the apartment complex parking lot.

Officer Lundy obtained a search warrant for the [Petitioner]'s residence. In the garage, he found some rope hanging on the wall. The rope was photographed, collected, and transmitted to the Tennessee Bureau of Investigation ("TBI"). Law enforcement also collected a DNA sample from the [Petitioner] with the [Petitioner]'s consent.

Donna Nelson, a special agent forensic scientist with the serology DNA unit at the Memphis Regional Crime Laboratory, testified that blood located on underwear recovered from the victim's body matched the [Petitioner]'s DNA.

Special Agent Linda Littlejohn of the TBI Crime Laboratory testified that she performed fiber comparisons. She analyzed the rope recovered from the victim's body and the rope recovered from the [Petitioner]'s residence. She testified that the two ropes did not match.

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, testified that she performed an autopsy on the victim on November 24, 2010. She determined the cause of death to be "asphyxiation due to ligature strangulation." Dr. Chancellor explained that, although it took two

to three minutes to accomplish an individual's death by strangulation, the individual would lose consciousness in less than ten seconds.

Officer Darnell Bridgeforth, Jr., of the MPD testified that he responded to the Cedarwoods Cove address on February 22, 2010, on a domestic assault call. He spoke with the black female victim who stated that she had been assaulted by her boyfriend. Officer Bridgeforth described the victim's demeanor as "distraught" and added that her hair was "messed up." She advised him that her boyfriend was Richard Dickerson. After reviewing his report, he identified the victim as the victim in this case.

Barbara Scott, an employee of the Hair Design School in Memphis, testified that the victim was one of her students. The [Petitioner] was also one of her students. She testified that the victim and the [Petitioner] met at the school and began dating. Scott stated that, in late February 2010, she noticed bruises around the victim's neck. The victim did not tell her how she got the bruises.

Monica Parker testified that she went to "hair school" with the victim and that they had been friends. She also knew the [Petitioner] from school. Beginning in August 2010, the victim stayed with Parker at Parker's apartment two or three nights a week. On one occasion after the victim began staying with her, the [Petitioner] called Parker and told her that the victim was on her way to Parker's apartment "and that she might be crying." When Parker asked the [Petitioner] why the victim might be crying, he told her that he spit on her. When the victim arrived, the victim told Parker that the [Petitioner] had bitten her. The victim showed Parker what appeared to be a bite mark on the victim's cheek.

On cross-examination, Parker explained that, when the victim was not spending the night at Parker's apartment, the victim was with either her grandmother or with the [Petitioner]. At one point, the victim's grandmother "put her out" because the victim had resumed her relationship with the [Petitioner]. Parker stated that the bite mark was not bleeding when she observed it. During her phone call with the [Petitioner], the [Petitioner] told her that he had not meant to hurt the victim.

The [Petitioner] testified that he was responsible for the victim's death. He explained that she came over to his house and that they started to have sex. They stopped, however, because the victim wanted to talk to

- 7 -

him. They got into an argument. The victim "start[ed] swinging." He told her to stop, but, he testified,

> [s]he kept swinging. I grabbed her told her to stop. She kept on and I like was choking her but I wasn't trying to—I wasn't trying to harm her. I wasn't trying to kill her and like I put her on the floor and got on top of her and told her to stop swinging at me and she kept on doing that and she just stopped. She stopped. After I noticed she done closed her eyes, I panicked. I wanted to call the police but I was scared.

When the [Petitioner] realized that the victim was dead, he put her clothes on her body and put her body in the trunk of her car and drove to some nearby apartments.

Asked about the rope around the victim's neck, the [Petitioner] answered,

> We already had some rope in that trunk of that car and it was like a small portion of it. I didn't want to put the rope around her neck but like I got scared just—I just tied it around her neck because I don't know if I was driving the car or she would just wake up or what. I didn't know what would happen. I don't know. I didn't put it on there tight. I just wrapped it around there and like cut the ends up off of it.

The [Petitioner] denied that he planned or expected to kill the victim.

In rebuttal, the State re-called Monica Parker. Parker testified that she never saw the victim scream at anyone or hit anyone. She testified about an occasion at "hair school" when she was talking to the victim on the phone and, when the [Petitioner] realized she was speaking with the victim, the [Petitioner] "went off" on her (Parker), "yelling and screaming" at her.

The State also re-called Barbara Scott, who described the victim as "a very loving, caring, happy little girl that had been sheltered." Scott described the [Petitioner] as "a young man that was very angry and violent." She explained that he had been subject to discipline at the hair school for "outbursts or cursing."

- 8 -

After considering this proof, the jury convicted the [Petitioner] of the lesser-included offense of second degree murder. After a sentencing hearing, the trial court sentenced the [Petitioner] as a Range I offender to the maximum term of twenty-five years' incarceration.

Id. at *1-6.

The Petitioner filed a timely petition for post-conviction relief on September 25, 2015, which he amended on December 13, 2016. He raised numerous complaints in his petition and amended petition, including those pursued on appeal, namely that trial counsel was ineffective in failing to investigate his presentence report and in forcing him to testify at trial. The post-conviction court conducted evidentiary hearings on the Petitioner's issues on June 24, 2016, and December 13, 2016.

At the June evidentiary hearing, trial counsel testified that he was appointed to represent the Petitioner and had been a criminal defense attorney for eighteen years, handling "hundreds" of murder cases over the course of his practice. He further testified that "whether or not [the Petitioner] testified" was a "point of contention" between trial counsel and the Petitioner, and the two discussed whether he would testify "at length many, many times." When trial counsel learned that a particular witness, a friend of the Petitioner's, was going to give the "most damning" testimony against the Petitioner, trial counsel testified that he told the Petitioner that he needed to stop asserting "'it wasn't none of me.' Because everything suggested it was." He further explained that he told the Petitioner it was his opinion, based on the State's evidence, that if the Petitioner did not stop asserting "'I didn't do it and it wasn't me and I wasn't there,' that he was going to be convicted and he would serve life in prison." The Petitioner "didn't believe [trial counsel]" that his friend was going to testify against him, and trial counsel testified that he gave a generic opening statement at trial so that the Petitioner could hear the "damning" testimony before deciding whether he wanted to testify. Trial counsel stated that the Petitioner decided to testify on his own behalf after hearing his friend's testimony because "he's intelligent enough[;] he saw the testimony."

Regarding the Petitioner's sentencing, trial counsel testified that he did not review the sentencing hearing transcript, but recalled that the Petitioner "won when he didn't get first degree murder." He further stated that he "did what he could" regarding the Petitioner's sentencing, but that the Petitioner:

[D]idn't really help himself . . . at sentencing he sat back with his arms across three chairs and his body language was like he just didn't care. And I don't know what mitigation I could have put on for him. And the facts were the facts. And the facts were terrible.

The post-conviction court held a second evidentiary hearing on December 13, 2016. The Petitioner affirmed that he was made aware of his rights by both trial counsel and the trial court during his Momon hearing and "went on and testified . . . went on with [trial counsel's] strategy." He further affirmed that he testified of his own free will. With respect to his sentencing hearing, the Petitioner alleged that trial counsel did not ask him about his criminal history, but conceded that trial counsel argued the Petitioner's criminal history should not have been considered as an enhancement factor because he completed diversion and therefore did not technically have a criminal history. He further conceded that this frustration was directed more towards the trial court than trial counsel, stating that "[trial counsel] said I didn't have no history, but [the trial court] still allowed certain issues."

Following the evidentiary hearings, the post-conviction court entered a written order denying the Petitioner's petition for post-conviction relief on July 31, 2017. The Petitioner now appeals the denial of his petition.

## ANALYSIS

On appeal, the Petitioner alleges he received ineffective assistance of counsel because trial counsel forced him to testify at trial and because trial counsel failed to discover a mistake in his presentence report.

The post-conviction petitioner bears the burden of proving his factual allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of

- 10 -

counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.").

In denying the Petitioner's petition for post-conviction relief, the post-conviction court made the following findings with respect to the issues the Petitioner now raises on appeal:

> Trial counsel testified that a recurring theme of his and [the] Petitioner's attorney-client relationship was whether [the] Petitioner would testify or not, and therefore trial counsel and [the] Petitioner discussed the possibility of [the] Petitioner taking the stand on a regular basis. Additionally, [the] Petitioner acknowledged that he understood and was aware of his right to remain silent prior to testifying, and that his testimony was of his own free will.
>
> . . . .

- 11 -

[The] Petitioner alleges that trial counsel should have specifically presented evidence that [the] Petitioner's previous charge of facilitation of aggravated burglary was reduced to assault-bodily harm. [The] Petitioner admitted in the evidentiary hearing that trial counsel did argue that [the] Petitioner's criminal history should not be considered as an enhancement factor, and that [the] Petitioner's frustration was with the trial court because the court took [the] Petitioner's criminal history into account anyway.

The record wholly supports the post-conviction court's finding that the Petitioner received effective assistance of counsel. The transcripts of the post-conviction evidentiary hearings reveal, based on both trial counsel's testimony and the Petitioner's own testimony, that the Petitioner understood he did not have to testify but decided to do so anyway of his own free will after hearing "damning" testimony against him. Further, the Petitioner had the opportunity to discuss whether he would testify at length multiple times with trial counsel, and trial counsel even gave him the opportunity to hear the testimony against him before deciding whether to testify. Although the Petitioner argues that trial counsel's "threat of life imprisonment" forced him to testify, trial counsel testified he only told the Petitioner that it was his opinion that, based on the amount of evidence that the State had against him, he would be convicted of first degree premeditated murder as charged and sentenced to life imprisonment if he continued to deny that he had any involvement in the murder, and the post-conviction court accredited such testimony. In following trial counsel's advice, the Petitioner's testifying allowed the jury to find an absence of premeditation, leading to him being convicted of second degree murder, a lesser offense. Again, as we have laid out, the Petitioner affirmed both at his <u>Momon</u> colloquy and at the evidentiary hearing that he testified of his own free will. Based on the overwhelming physical and testimonial evidence against the Petitioner presented by the State at trial, the Petitioner has failed to show how his testimony prejudiced him or how trial counsel was deficient. In fact, the record indicates that following trial counsel's advice to testify was beneficial to the Petitioner.

With respect to the Petitioner's argument that he received ineffective assistance because trial counsel did not correct the court's erroneous application of his criminal history, the evidentiary hearing transcripts reveal that such an argument is contradictory to the Petitioner's own post-conviction testimony. The Petitioner affirmed that trial counsel argued against the court's consideration of the Petitioner's prior criminal history as an enhancement factor, stating that his completion of diversion meant the Petitioner technically did not have a criminal record. The Petitioner also affirmed that his frustration was really directed toward the trial court for considering his criminal history, not toward trial counsel. Trial counsel testified that he did everything possible for the Petitioner with respect to sentencing. Further, the post-conviction court noted that even if trial counsel had not objected to the use of the Petitioner's criminal history as an

- 12 -

enhancement factor, it is "within the court's discretion to impose any sentence allowable under the appropriate range of punishment." Therefore, the Petitioner has failed to show how trial counsel was deficient or how he was prejudiced. In sum, we conclude that the post-conviction court properly determined that the Petitioner failed to meet his burden of demonstrating that trial counsel was ineffective, and we accordingly affirm the denial of the petition.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court denying the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE